# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 21, 2016 Session

## CHRISTOPHER DYLAN THOMPSON v. BEST BUY STORES, L.P.

**Appeal from the Circuit Court for Hamilton County**
**No. 14C859      L. Marie Williams, Judge**

_____

### No. E2015-02304-COA-R3-CV-FILED-NOVEMBER 28, 2016

_____

Plaintiff Christopher Dylan Thompson ingested several doses of a liquid form of a drug, which he says was estazolam, before reporting to work for his employer, defendant Best Buy Stores, L.P.  At work, he appeared tired and slow, and a manager told him to clock out and end his shift early.  On his way home, plaintiff was involved in a car accident.  He brought this negligent entrustment action, alleging that defendant breached a duty by not stopping him from leaving his place of employment in his own vehicle.  The trial court granted defendant summary judgment, holding defendant "had no duty to prevent [plaintiff] from leaving the premises driving his own vehicle," and relying on ***Lett v. Collis Foods, Inc.***, 60 S.W.3d 95 (Tenn. Ct. App. 2001), a factually similar case decided by this Court.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and ARNOLD B. GOLDIN, JJ., joined.

Kent T. Jones, Chattanooga, Tennessee, for the appellant, Christopher Dylan Thompson.

K. Stephen Powers and Travis B. Holly, Chattanooga, Tennessee, for the appellee, Best Buy Stores, L.P.

### OPINION

### I.

On March 6, 2014, a package arrived in the mail for plaintiff.  It contained a vial of a drug in liquid form, which plaintiff alleged to be estazolam, the generic equivalent of ProSom, a "chemical cousin of valium."  Plaintiff testified that he ordered it via the

internet on what he referred to as the "grey market." He said he did not know how much of the drug came in the vial, maybe "2 to 4 milliliters." Plaintiff stated that he pulled the package out of the mail as he was backing out of his driveway to go to work for defendant. He took two drops of the estazolam with the dropper that came with the vial and continued on his way to work. When he arrived at the Best Buy parking lot, he took another drop and then went in to work. Plaintiff testified that he remembers clocking in, but after that, he has no memory of anything else that happened that day.

Cory Blake Howell, an assistant sales manager, testified that a co-worker of plaintiff told Howell that plaintiff was acting slow, tired and not very responsive. Based on the co-worker's description of plaintiff's conduct, Howell declined to allow plaintiff to operate a large piece of machinery called "Big Joe" in the warehouse part of the store. It was used to lift boxes for storage on high shelves. Howell told plaintiff to clock out and end his shift sometime between 6:00 and 7:00 pm. Plaintiff got in his car, presumably heading to his mother's house, where he then resided. At 7:02 pm, Chattanooga police officer Michael Sharp, Jr. received a notification of an accident that occurred on Highway 153 north, just before the Chickamauga bridge. Plaintiff's car had hit a median wall on the left side, bounced off, and hit a pickup truck on its left rear side. Apparently both vehicles were totaled in the accident.

Officer Sharp testified that he spent ten to fifteen minutes talking with plaintiff at the accident site. Plaintiff told him he thought one of his tires had a blowout, which caused him to lose control. Officer Sharp testified that the car's left front tire had a large slit, which would be consistent with a blowout, but might also have been caused by the car striking the median wall. Officer Sharp saw no indication that plaintiff was under the influence of an intoxicant. He said plaintiff was responsive and conversed normally, and that if plaintiff's car had been drivable, he would have allowed plaintiff to continue driving home.

An unidentified female arrived on the accident scene and said she was going to drive plaintiff home. Officer Sharp testified that the two seemed friendly and he assumed that they knew each other. Plaintiff and his mother testified that she was a stranger to them. She drove him to his mother's house. Plaintiff's mother, Staci Thompson, testified that plaintiff was stumbling, "not making any sense, talking out of his head." The next morning, she had plaintiff admitted to Moccasin Bend mental health institute, where he spent several days. Plaintiff testified that he does not remember the next several days after the accident.

On July 16, 2014, plaintiff filed this action, alleging that defendant was negligent in allowing him to leave the store's premises in an inebriated state. Plaintiff's theory was that defendant was liable for negligent entrustment of his *own* vehicle under the

2

circumstances. Following discovery, defendant moved for summary judgment, arguing that it had no legal duty to prevent plaintiff from leaving its premises in his car; that defendant's actions could not be shown to have caused plaintiff's alleged injuries; and that as a matter of law, defendant did not "entrust" plaintiff with his own car because it had no right to exercise control over that vehicle. The trial court granted the motion, holding:

> The *Lett* case establishes that Best Buy had no duty to prevent [plaintiff] from leaving the premises driving his own vehicle. There is no evidence in the record that Best Buy contributed to, caused, or condoned [plaintiff's] condition which allegedly is a result of the ingestion of a certain medication. The accident did not occur on Best Buy's premises and [plaintiff] had been told to clock out. He no longer was under Best Buy's control and there is no evidence he was told to leave the premises.

>              \*      \*      \*

> The defendant has offered evidence through the testimony of the investigating officer that [plaintiff] was not so impaired as to be unable to operate a motor vehicle. The plaintiff has brought forth no evidence to the contrary and presumably relies upon the fact of the accident as evidence of impairment. This reliance is insufficient to overcome the [m]otion for [s]ummary [j]udgment. Therefore, there is no evidence of causation.

> Plaintiff sues defendant also on a negligent entrustment claim. The vehicle or chattel in issue is [plaintiff's] own car. Best Buy exercised no control of the vehicle and had no right to control the vehicle . . . A negligent entrustment cause of action requires the defendant to supply a chattel to an incompetent user. "Negligent entrustment is committed at the moment when control of the chattel is relinquished by an entrustor to an incompetent user." *West* [*v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 555 (Tenn. 2005)]. . . . [T]he chattel involved is the motor vehicle owned and operated by the plaintiff. There was no control or right of control of that motor vehicle by the defendant.

Plaintiff timely filed a notice of appeal.

## II.

Plaintiff raises the following issue, as quoted from his brief:

> Whether [d]efendant, . . . knowing of [plaintiff's] incapacity to operate machinery and inability to communicate with workers, customers and management, [is] responsible for [n]egligent [e]ntrustment for letting him leave the premises in his automobile, without calling his secondary and/or emergency numbers, when he subsequently totaled two automobiles[.]

## III.

Regarding our standard of review of a grant of summary judgment, the Supreme Court has recently stated as follows:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.

> \* \* \*

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

4

***Rye v. Women's Care Ctr. of Memphis, MPLLC***, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (italics in original).

In making the determination of whether summary judgment was correctly granted,

> [w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008); ***Luther v. Compton***, 5 S.W.3d 635, 639 (Tenn. 1999); ***Muhlheim v. Knox Cnty. Bd. of Educ.***, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See **White v. Lawrence***, 975 S.W.2d 525, 529 (Tenn. 1998); ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995).

***Wells Fargo Bank, N.A. v. Lockett***, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App. E.S., filed Apr. 24, 2014).

**IV.**

In ***Lett v. Collis Foods, Inc.***, 60 S.W.3d 95 (Tenn. Ct. App. 2001), an employee reported for work at a Waffle House restaurant in an obviously intoxicated state. The defendant employer tried to sober her up and offered her a ride home, which she refused. ***Id.*** at 97. The employee wrecked her car on the way home, injuring the plaintiff in the accident. We addressed the question of whether "the defendant employer owed a duty to a third person to prevent an intoxicated employee from leaving work and driving home." ***Id.*** We stated:

> To establish duty, a plaintiff must show that there exists a "legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." [***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995)]. A risk of harm is unreasonable "if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." ***Id.*** In making this determination, several factors are important: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential

harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; and (5) the feasibility, relative usefulness, relative safety, and relative costs and burdens, of an alternative, safer course of conduct. *Id.* As previously indicated, the question of whether one person owes a duty to another is a question of law to be decided by the court.

Lett argues that Collis Foods was negligent in permitting Mills to drive home in her condition. Implicit in this argument is the contention that Collis Foods had a duty to *prevent* Mills from driving home from work in an intoxicated state.

\* \* \*

[A] crucial question is whether Collis Foods had the means and ability to control Mills' conduct. If it did not have the means or the ability to control the conduct in question, then Collis Foods had no duty to control same, and it cannot be held to be negligent for failing to do so.

\* \* \*

We find that the facts of the instant case . . . do not present affirmative acts sufficient to impose a duty upon Collis Foods to control the conduct of Mills, who was off-premises and off-duty as well. She arrived at work intoxicated, and Collis Foods did not contribute to, condone, or seek to accommodate, her intoxication. It did not require her to drive home; in fact, it attempted to find her safe passage home, but she refused. In sum, the employer did not provide her mobility she otherwise did not have; it did not encourage her to drive home; and it did not contribute to the condition that made it unsafe for her to drive. In effect, the employer "did no more than acquiesce in [her] determination to drive [her] own car." *Cecil* [*v. Hardin*], 575 S.W.2d [268,] 272 [Tenn. 1978].

\* \* \*

6

It is important in this case to recognize that Collis Foods did absolutely nothing to *contribute* to Mills' state of intoxication or her decision to drive herself home. When she clocked in, she was already inebriated. At that juncture, the employer was presented with an intoxicated employee "on the clock" who, because of her condition, could not perform her duties. . . . Collis Foods had no legal right to tie her up or "sit on her" or otherwise prevent her from driving away in her own car. From a legal standpoint, it did not have the means or the ability to control its employee when she made the decision to drive a vehicle in her condition. The employer certainly was under no obligation to allow Mills to stay "on the clock" or to stay on its premises when she was too inebriated to work. The employer's passive acquiescence in her leaving the premises and driving away in her own vehicle, acts they had no legal right to prevent, is simply not enough to impose a duty on this employer who was totally blameless in the condition – Mills' intoxicated state – that led to the accident and the plaintiff's injuries. In our judgment, Collis Foods took no *affirmative* steps that contributed to or facilitated Mills' negligent act – driving a motor vehicle while under the influence of an intoxicant.

*Id.* at 99, 100, 103, 105 (emphasis in original; footnote and internal citation omitted); *see also **Williams v. Wal-Mart Stores East, L.P.***, 832 F.Supp.2d 923, 928 (E.D. Tenn. 2011) (quoting and applying ***Lett*** in holding no duty of employer to prevent impaired employee from driving home in her own vehicle).

In ***Lett***, we addressed the question of an employer's duty to an injured third person, whereas in this case we are presented with the issue of the employer's duty to prevent the employee from injuring himself. In ***Lett***, we held that an employer had no duty to an innocent third party. It would be plainly absurd to now hold that an employer has a duty to attempt to prevent injury to an employee who voluntarily went to work in an allegedly impaired state.

With the principles established by ***Lett*** and ***Williams*** in mind, we review the proof presented to the trial court, which consisted largely of deposition testimony. Assistant manager Howell testified by deposition:

Q. Did any . . . employees of Best Buy that you were privy to that day have anything to say about [plaintiff]?

A. The only person I had communication with about [plaintiff] was Dagnan.[1]

Q. Okay. What did Dagnan exactly tell you?

A. Dagnan said he was not responding to the instructions Dagnan was giving him in terms of unloading the truck and that was – he was just acting slow and not really responding to him at all.

Q. Okay. Did Dagnan ever mention the term "drugs" or whether he was on drugs?

A. Not to my memory, no.

Q. Okay. Was that a suspicion?

A. I had no suspicion of it, no.

Q. Okay. Do you know if Dagnan did?

A. I cannot speak for Dagnan, no.

\*　　\*　　\*

Q. What were you afraid would happen to [plaintiff] if he operated machinery?

A. If someone is acting slow and not communicating well, I'm afraid they can't communicate on Big Joe, which is the machinery in question. Do you know how Big Joe works?

Q. No, I don't, but you can go ahead and explain.

A. Okay. Big Joe is a piece of equipment that raises you into the air allowing you to unload and load heavy boxes on top of rafters. This machinery requires you to communicate as you

---

[1] "Dagnan" is obviously another employee of Best Buy, but the record does not reveal any other information about this person. He or she did not testify.

go up and as you go down. If you cannot communicate as you go up and as you go down, someone could be stuck underneath you as you're coming down or as you're going up and cause an injury. If someone is not communicating very well, I cannot have them operating that machinery.

Q. Okay. Now, when you use the term "not communicating very well," could you elaborate on that?

A. I got that from Dagnan, who basically would ask – you know, would give him instructions, and he wouldn't be as responsive to Dagnan. So in terms of doing that, if you're not being responsive to someone who is giving you instructions or not responding to them, I can't expect you to respond on your way down on a big heavy machinery.

\* \* \*

A. I'm not sure I can rate someone's competency on a one-to-ten scale. I just made the judgment call that he was not competent enough to operate Big Joe.

Q. Okay. Would you agree that if someone is not capable of operating Big Joe that they are likewise not capable of operating an automobile?

A. I believe they're two different kinds of vehicles, and no, they're – they're – to me, they're two different . . . they're not similar things at all.

\* \* \*

A. I talked to [plaintiff] and said, "I think it's best for you if you go ahead and clock out today. I don't need you operating machinery in the back." And then he proceeded to ask if he was in trouble. And I kept telling him that he was not, no.

The next morning, Howell called store manager Wendell Norman, Jr. to let him know that he had told plaintiff to clock out early the night before "because he was acting slow and tired." Norman was not at the store during the evening of March 6, 2014, but

he was the Best Buy employee who talked with plaintiff's mother after the accident. Norman testified as follows:

> Q: . . . Did you or anyone else at Best Buy know that [plaintiff] was incompetent?
>
> A. No.
>
> *    *    *
>
> Q. Did the employer Best Buy or anybody have reason to know that [plaintiff] was incompetent? When I say "incompetent," let me put it in layman's terms. He just ain't ready to drive an automobile. Did anybody say that?
>
> A: No.
>
> Q. No. On March 6th, 2014, why did [plaintiff] leave Best Buy before the end of his shift?
>
> A. I was not part of that. I wasn't there. I found out the next day, so they just said – Cory Howell said [plaintiff] was a little slow.
>
> Q. Is that all he said?
>
> A. That's it. He said he didn't feel comfortable with him operating machinery.
>
> *    *    *
>
> Q. [D]id Cory Howell send [plaintiff] home?
>
> A. No.
>
> Q. Who did?
>
> A. Nobody did.
>
> Q. [Plaintiff] just left?

A. We told [plaintiff] to clock out.

Q. Okay.

A. Nobody said you have to leave the premises or anything like that. He just said you need to clock out. You're a little slow.

Q. Is it typical for people that clock out to stay in the premises of Best Buy?

A. Yes.

Q. What would they do?

A. We have a nice break room, a nice TV on the wall, Direct TV. A very comfortable environment.

Shortly after plaintiff clocked out and headed for his mother's house, the accident occurred. Officer Sharp testified as follows regarding the circumstances of the accident and plaintiff's apparent condition:

Q. All right. And did you ask [plaintiff] if he had had any injury from the accident?

A. I did. That's the first thing I check on an accident.

Q. And what did he tell you?

A. He said, "No," he was fine at that time.

Q. All right. And what did you mark down on your report about any injury to [plaintiff]?

A. No injury.

Q. Did you observe him, his physical appearance to determine whether or not you saw any indication of an injury?

A. Yes.

11

Q. Upon your talking to him did you have any reason to believe that he had any injury?

A. No.

* * *

Q. Upon your observation of him and speaking to him and his behavior at the scene, what did you indicate on your report as to his condition?

A. He was normal at the time.

Q. Did you carefully observe any signs, for any signs of any alcohol or drug use?

A. I did. I was in his personal space while questioning him and getting his license and didn't observe any at the time.

Q. Is that part of your training as a patrolman to be able to assess the conditions of drivers as far as alcohol and drug abuse?

A. Yes. That's correct.

Q. Did you see any need to request any alcohol or drug testing?

A. No, I did not.

* * *

Q. Based upon your observations of [plaintiff] and your speaking to him at the scene, observing his behavior at the scene, had the vehicle been drivable would you have allowed him to drive it home?

A. Yes.

* * *

12

Q. Was he able to give you his driver's license without any delay?

A. Yes.

Q. And was he able to converse with you in normal conversation without any problems at all?

A. Yes.

Q. His speech wasn't delayed or slurred?

A. No.

Q. There wasn't anything about his speech or his conduct that told you that he had any sort of health condition?

A. No.

Q. Or that he had any injury in the accident?

A. No.

Q. Did [plaintiff] tell you that he was just tired?

A. He did at one point, said he was sent home from Best Buy from work for being tired.

Q. Did you question him any further about that?

A. No. I didn't see a reason to at the time.

Q. But did he appear to be tired to you?

A. No. Not at – not 100 percent. I mean, he wasn't – you know, he could talk to me fine. He was walking fine. To me, there was no – his eyes weren't drooping or anything of that nature, so I just went off of what he told me at that time.

Q. And his speech wasn't delayed –

13

A. No.

Q. – or short or anything like that?

A. No. He was able to answer all my questions.

The above testimony from assistant manager Howell, manager Norman, and officer Sharp, is all uncontroverted. Plaintiff's mother, Staci Thompson, testified that she spoke with Norman the morning after the accident, describing the conversation as follows:

> Q. What was it that Mr. Norman told you that made you believe that personnel at Best Buy had knowledge that [plaintiff] was incompetent to drive?
>
> A. He told me that [plaintiff] was speaking like a foreign language. He said that he was out of his head. He was speaking gibberish and that they had sent him home because he just – he wasn't even there.
>
> *       *       *
>
> Q Then his next statement was I was worried about him?
>
> A. Yes. He said he was worried about him, that he had heard [plaintiff] was messed up the night before. He left his cell phone there.

Norman flatly denied this account of the conversation, saying, "I disagree with all of it." It is undisputed that Norman was not at the Best Buy store the evening of the accident. Accepting Staci Thompson's testimony as true for purposes of summary judgment, it would establish that Norman told her that someone at Best Buy told him that plaintiff was "out of his head" and "messed up" at work. This factual scenario would make the situation arguably closer to the facts in *Lett*, where the employee was obviously intoxicated, and we found no duty of the employer to restrain her from leaving her workplace. Our observations in *Lett* are applicable here. In this case, defendant, the employer, did nothing to contribute to plaintiff's incapacitated state, nor did it "have the means or the ability to control its employee when [he] made the decision to drive a vehicle in h[is] condition." *Lett*, 60 S.W.3d at 105. *Lett* is controlling, and mandates the conclusion that defendant had no legal duty to prevent plaintiff from voluntarily getting in his car and leaving his workplace under the undisputed circumstances.

Regarding plaintiff's claim of negligent entrustment, the case of ***West v. E. Tenn. Pioneer Oil Co.***, 172 S.W.3d 545 (Tenn. 2005), is instructive. In ***West***, the Supreme Court held that "convenience store employees owe[d] a duty of reasonable care to persons on the roadways when the employees sell gasoline to an obviously intoxicated driver and/or assist the driver in pumping the gasoline into his vehicle." ***Id.*** at 547. In its discussion of the tort of negligent entrustment, the Court stated:

> To prevail on such a claim "*requires proof that a chattel was entrusted* to one incompetent to use it with knowledge of the incompetence, and that its use was the proximate cause of injury or damage to another." ***Woodson v. Porter Brown Limestone Co.***, 916 S.W.2d 896, 907 (Tenn. 1996) (citing Restatement (Second) of Torts § 390 (1964)); *see also **Ali v. Fisher***, 145 S.W.3d 557, 562 (Tenn. 2004). The Restatement explains negligent entrustment as follows:
>
> > One who *supplies directly or through a third person a chattel* for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.
>
> Restatement (Second) of Torts § 390 (1965).
>
> \*       \*       \*
>
> Liability for negligent entrustment is founded upon the supplier's direct negligence in entrusting the chattel to an incompetent user. . . . A negligent entrustment is committed at the moment *when control of a chattel is relinquished* by an entrustor to an incompetent user. ***Ali***, 145 S.W.3d at 564 (citing ***Harper v. Churn***, 83 S.W.3d 142, 146 (Tenn. Ct. App. 2001)). *Control therefore need only exist at the time of the entrustment for a prima facie case of negligent entrustment.*

*Id.* at 554, 555 (emphasis added).  As the trial court correctly held, the chattel allegedly "entrusted" to plaintiff was his own vehicle.  Defendant never had control of the vehicle, so it cannot be said that it entrusted the car to plaintiff.  Consequently, plaintiff cannot establish an element of a prima facie case for negligent entrustment, and summary judgment was correctly granted by the trial court.

Defendant argues that this appeal should be held to be frivolous.  We do not hold that it is so entirely without merit as to be deemed a frivolous appeal.

## V.

The judgment of the trial court granting defendant summary judgment is affirmed.  Costs on appeal are assessed to the appellant, Christopher Dylan Thompson.  The case is remanded for collection of costs assessed below, in accordance with applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE

16